**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 21-CR-60332-SMITH

**UNITED STATES OF AMERICA**

                    Plaintiff,

vs.

**MICHAEL SIMPSON JR.**

                    Defendant,

_____/

<u>**MEMORANDUM IN AID OF SENTENCING**</u>

"Each of us is more than the worst thing we've ever done.[1]"

**PRELIMINARY STATEMENT**

On October 17, 2022, Defendant Michael Simpson Jr., ("Defendant" or "Michael")

pursuant to a plea agreement [ECF # 52] with the government entered a plea of guilty to Count I

of the Superseding Indictment [ECF #36], Enticement of a Minor pursuant to 18 USC 2422(b).

Through his counsel, Defendant respectfully submits this memorandum in aid of sentencing.

I.       **INTRODUCTION/BACKGROUND:**

Michael Simpson Jr. is a 24-year-old life-time resident of Broward County, Florida.

Michael Simpson stands before this court today due to making the biggest mistake of his young

life.  Michael is so much more that the picture painted by the indictment in this case, he is a

young hardworking man who has strived to work his way past his own mental issues and his

educational limitations.  Michael is a man who loves his family and enjoys a quiet simple life.

---

[1] Bryan Stevenson, *Just Mercy* (2014)

The court will have an opportunity to read letters from friends and family that will show the true selfless person that Michael really is. (*See* Composite Exhibit #1).

It is said that, "[Y]ou can tell the character of a person by how he treats those who can do nothing for him[2]."  Michael's mother recounts a time when Michael was driving home from work late one night and saw a car stranded on the side of the road.  The vehicle was disabled with car trouble. Michael, not knowing these people, went home, got his tool box and went back to offer help to the stranded motorists.  Michael did this simply because he could help and he knew that it was the right thing to do.  Michael ultimately was able to get their car started and back on their way.  This is an example of the selfless person that Michael truly is.

Michael Simpson was born on February 9, 1998 in Fort Lauderdale, Florida to Michael Simpson Sr. and Vashti Simpson.  Unfortunately for Michael, he was born into a household of dysfunction and mental illness.  Michael grew up seeing his father verbally and physically abuse his mother.  Michael did not know it at the time, but he was seeing his father's undiagnosed mental health issues.  This upbringing made Michael a shy and quiet child who would not speak much.

Michael struggled in school due to a speech delay.  Instead of focusing on himself, Michael would seek to take care of his siblings.  Michael's younger brother, Zachary Simpson (Age 19), is on the Autism Spectrum.  Since a young age, Michael and Zachary have had a bond that transcends siblings.  Michael has been a constant in Zachary's daily life, helping him navigate a difficult world for a person with Autism.  This continued as he grew up where he would put the needs of others, family and strangers, ahead of his own needs.   Although Michael

---

[2] Quote attributed to German Poet Johann Wolfgang von Goethe

was genuinely liked and trusted by those around him, Michael struggled with his own inner issues.

Michael, like his father, would suffer from mental health issues.  While in high school, Michael began cutting himself.  When confronted about the cutting, Michael stated that it helped him with the pain that he had inside.  Mental illness has been a hallmark of Michael's life, be it from seeing his father's undiagnosed mental illness to his own.  Dr. Michael Brannon of the Institute for Behavioral Sciences and the Law interviewed Michael on October 28, 2022 for a Forensic Psychiatric Evaluation.  (*See* Exhibit #2).  Applying the standards of the DSM-V, Dr. Brannon diagnosed Michael with Bipolar I Disorder with possible psychotic features and Attention-Deficit/Hyperactivity Disorder.

In addition to his own mental health issues, Michael has had more than his share of physical issues as outlined in the Pre-Sentence Investigation Report. (See ECF#55 ¶65-66).  In one such incident in 2017, Michael was involved in a car accident as a passenger where he sustained long standing back injuries and memory loss as a result of the accident.  The most concerning effect of the accident was that Michael began experiencing auditory hallucinations and anger issues as a result of the accident.

## II.    FACTS OF THE CASE

Michael, while dating the victim's mother, drove the victim, her mother and younger sister to go shopping at a local shopping plaza.  When they arrived at the shopping plaza, the victim's younger sister was asleep in the back seat.  The victim's mother left the vehicle to go to one of the stores in the shopping plaza leaving the victim and her sleeping sister in the car with Michael.  Once alone in the car, Michael took out his phone and began viewing pornography on it in full view of the victim.  Michael began to masturbate in a manner to allow the victim to see

what he was doing.  Michael asked the victim if she wanted to watch and if she wanted to help. The victim responded to each question in the negative.  Michael finished masturbating by ejaculating into his hand at which time he asked the victim if she wanted to try the white stuff. Again, the victim responded in the negative.  Michael apologized to the victim and asked her not to say anything.  (ECF #51 at ¶3).

Michael voluntarily contacted Broward Sheriff's Detective Daniel Rakofsky to meet and provide a statement to detectives about the case. (*See* PSI #51 at ¶19).  Michael, appearing by himself and without legal counsel or any promises of leniency, spoke to law enforcement and ultimately admitted to the above action.  Michael was charged by the State of Florida (21-8520CF10A) and the United States for his actions.  A full recitation of the offense conduct is included in the Factual Proffer (ECF #51)

### III.     PROCEDURAL BACKGROUND AND SENTENCING GUIDELINES

Michael pleaded guilty to one count of Enticement of a Minor (18 U.S.C. § 2422(b)). [ECF #51, 52]. The minimum term of imprisonment is 10 years with a statutory maximum sentence of life imprisonment.  Undersigned counsel, the PSI and the plea agreement suggests that Michael's total offense level, without any variances or adjustments is 41 with a criminal history category of I.  As such, the base *advisory guideline* range is 324 to 405 months.

### IV. OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Michael has offered objections to the PSI which are detailed further in the final PSR submitted to the court.

### V. SENTENCING MEMORANDUM

### A.  STATUTORY SENTENCING FACTORS:

As the Court is aware, district courts are now free from the mandatory nature of the Federal Sentencing Guidelines. This Court is assuredly well aware of the Supreme Court's precedent in *Booker*, *Gall*, *Rita* and the cases that follow them.  A lengthy recitation of the law, therefore, is unnecessary. The guidelines are advisory and, as a sentencing court, this Court must tailor the ultimate sentence imposed upon the defendant in line with the full range of the statutory considerations set forth in 18 U.S.C. § 3553(a). 18 U.S.C. § 3553(a) requires that the Court "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in the second paragraph of that same statute. *Rita v. United States*, 551 U.S. 338, 348 (2007).

The nature and circumstances of Michael's offense are serious.  Yet, as the Supreme Court recently reiterated, "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011).  Notwithstanding the above, "the court shall impose a sentence sufficient, but not greater than necessary," to comply with the purposes of 18 USC § 3553(a).

## B. THE § 3553(a) FACTORS SUPPORT A SUBSTANTIAL DOWNWARD VARIANCE

We respectfully urge the Court to vary below the advisory guideline range and impose the mandatory-minimum sentence of 10 years of prison followed by 20 years of probation which is sufficient – but not greater than necessary to satisfy the factors outlined in 18 U.S.C. § 3553(a). See *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). With the exception of the improper actions at issue here (for which Michael takes full responsibility and does not seek to minimize), Michael has led an exemplary life that has been dedicated to taking care of family. Given these facts, Michael's complete and total acceptance of responsibility, the serious

ramifications he has already endured and will continue to endure as a result of his conduct, Michael should receive a significant yet tempered sentence.

### C.  APPLICATION OF SECTION 3553(a) FACTORS

"It has been uniform and consistent in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  In fashioning a reasonable sentence, the Court has considerable discretion to weigh each of the §3553(a) factors.  Unless otherwise limited by law, the Court may consider, without limitation, any "information concerning the background, character, and conduct of" the defendant. 18 U.S.C. §3661; U.S.S.G. §1B1.4.

In the fiscal year 2021, 1,062 defendants were charged with a Sexual Abuse[3] related offense where 51.8% were sentenced under the under the Guideline Manual[4].    Of these defendants, 39.3%, were sentenced within the guideline range[5].  Of the remaining 48.2% of defendant's who were not sentenced under the Guidelines Manual, 43.4% of them received a downward variance where the average sentence reduction was 34.4%[6].

These guidelines, despite their excessive complexity, still fail to account for many of the myriad factors that are properly considered in fashioning just sentences.  A substantial variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which is considered by the guideline range.

---

[3] Sexual abuse offenders are those convicted of Criminal Sexual Abuse – Rape (§2A3.1), Statutory Rape (§2A3.2), Criminal Sexual Abuse of a Ward (§2A3.3), Abusive Sexual Contact (§2A3.4), Promoting a Commercial Sex Act (§2G1.1), Travel to Engage in Prohibited Sexual Conduct with a Minor (§2G1.3), Production of Child Pornography (§2G2.1), or Child Exploitation Enterprises (§2G2.6).
[4] USSC Quick Facts at https://www.ussc.gov/reaserch/quick-facts
[5] Id.
[6] Id.

### 1.   History and Characteristics of the Defendant

The significance of this factor is rooted in its understanding that a consideration of a defendant's criminal conduct cannot disregard the life he has led beyond her crime.  As noted in *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006)(Rakoff, J.), the importance of considering a defendant's entire history reaches its pinnacle at the time of sentencing.

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics' of the defendant. Id. at 513–14.

In *United States v. Early*, 686 F.3d 1219, 1223 (11th Cir. 2012), the Eleventh Circuit held that no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence.

The principle in *Adelson* that a defendant's criminal conduct must be measured against Michael's overall life.  For the weighing of the good with the bad in Michael's life reveals that his criminal conduct is incompatible to his life and is rooted in the mental health issues that have plagued him from birth.

Michael has absolutely no prior criminal convictions as evidenced by the PSI.  (*See* PSI ⁋50-52).  This consideration lends itself toward a lesser sentence. See, e.g., *United States v. Paul*, 239 Fed. App'x 353 (9th Cir. 2007) (defendant's 16-month sentence, the top end of the guideline range for unlawful receipt of federal funding, was unreasonably high because defendant was a first-time offender and had displayed remorse); *United States v. Jewell*, 2009 WL 1010877 (E.D. Ark. April 15, 2009) (defendant sentenced to 30 months in prison for aiding and abetting tax

evasion, because guideline range near the statutory maximum of 5 years was inappropriate for first time offender); *United States v. Cull*, 446 F. Supp. 2d 961 (E.D. Wis. 2006) (non-guideline sentence of 2 months in jail and 4 months home confinement, where advisory range was 10-14 months for marijuana offense by defendant who had never been confined, was sufficient to impress on him the seriousness of his crime and deter him from re-offending); *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) (generally, a lesser prison term is sufficient to deter one who has not been subject to prior lengthy incarceration)

### A.   MENTAL HEALTH

### 1.   Mental Health

Michael has struggled with mental health issues the majority of his life.  Dr. Michael Brannon of the Institute for Behavioral Sciences and the Law interviewed Michael on October 28, 2022 for a Forensic Psychiatric Evaluation.  (*See* Exhibit #2).  Applying the standards of the DSM-V, Dr. Brannon diagnosed Michael with Bipolar I Disorder with possible psychotic features and Attention-Deficit/Hyperactivity Disorder.  Proper diagnosis of mental health issues, acknowledging that there is a mental health problem and then treatment is the best and most effective way to reduce recidivism in criminal defendants who suffer from mental health issues.

Bi-Polar and related disorders are mood disorders characterized by episodes of mania and depression. Manic episodes cause a feeling of euphoria, unusually high energy and activity levels, and irritability. Depressive episodes cause sadness, hopelessness, fatigue, loss of interest in activities, and other symptoms of depression.  Depending on the type of the condition, a person with bipolar disorder may cycle through both of these moods or may experience depression with a less extreme type of mania called hypomania. Bipolar I, the disorder that triggers both depression and mania, may also cause symptoms of psychosis.

Psychosis is a specifier for bipolar disorder.  When a medical or mental health professional is diagnosing bipolar disorder, they may use specifiers. These are added details that describe an individual's experience and symptoms.  An individual who is diagnosed with bipolar disorder with psychotic features it means he or she meets the diagnostic criteria for bipolar but also has symptoms of psychosis.

Psychosis is a state of mind and a set of symptoms characterized by losing contact with reality. It is not a condition in and of itself but rather a group of symptoms that can be triggered by certain mental illnesses, like bipolar disorder, and by medical conditions, brain injuries, substance misuse, and some medications. Someone with bipolar disorder may experience psychotic symptoms during a manic or a depressive episode. The specific symptoms and their character or content vary by individual.

Adult attention-deficit/hyperactivity disorder (ADHD) is a mental health condition exhibited by difficulty maintaining attention, as well as hyperactivity and impulsive behavior. Adult ADHD symptoms can lead to a number of problems, including unstable relationships, poor work or school performance, and low self-esteem.[7]  Treatment for adult ADHD is similar to treatment for childhood ADHD, and includes stimulant drugs or other medications, psychological counseling (psychotherapy), and treatment for any mental health conditions that occur along with adult ADHD.[8]

Adults with ADHD may find it difficult to focus and prioritize, leading to missed deadlines and forgotten meetings or social plans. The inability to control impulses can range from impatience waiting in line or driving in traffic to mood swings and outbursts of anger.

Most research indicates that rehabilitative services are best delivered within a community

---

[7] http://www.mayoclinic.org/diseases-conditions/adult-adhd/basics/definition/con-20034552
[8] Id.

setting, rather than a setting of confinement. See e.g., *Washington State Institute for Public Policy: Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs and Crime Rates*, Exh. 4 at 9 (October 2006) (finding rehabilitative services delivered in non-custodial settings reduce recidivism rates at greater rates than do services delivered in custodial setting); see also Bruce P. Archibald, *Let My People Go: Human Capital Investment and Community Capacity Building via Meta/Regulation in a Deliberative Democracy – A Modest Contribution for Criminal Law and Restorative Justice*, 16 Cardozo J. Int'l & Comp. L. 1 at 79 (2011) (noting imprisonment isolates offenders from regular social interactions, inhibits their capacity to interact positively with well-integrated members of society, and disrupts family relationships).

Federal courts have granted variances after considering how a longer sentence would impair a defendant's rehabilitation. See *Gall v. United States*, 128 S. Ct. 586, 593 (2007); *United States v. Collington*, 461 F.3d 805 (6th Cir. 2006) (variance upheld because it sufficiently reflected the seriousness of the offenses while allowing the possibility for defendant to reform and go on to a productive life); *United States v. Autrey*, 555 F.3d 864 (9th Cir. 2009) (Court's finding that defendant would be better served by outpatient psychiatric treatment, supported reasonableness of imposing five years' probation instead of a guideline term of 41–51 months).

### 2.      Risk of Reoffending

On March 2, 2022, Dr. Michael Brannon of the Institute for Behavioral Sciences and the Law interviewed Michael for a "Forensic Psychiatric Evaluation: Sex Offender Risk Assessment."  (*See* Exhibit #3).  Dr. Brannon concluded:

> The examinee's score of 3 is in the comparison group classified as Average risk range (1.9%) on the STATIC-99R for sexual re-offending during the next five years. Individuals who obtained the same score as the examinee reoffended at a rate of 6.5% over five years and 10.1% over 10 years. In an abundance of caution, the examinee

should be considered for a polygraph examination to assess for other possible sexual contact offenses. Psychological testing revealed significant emotional distress including symptoms of depression, anxiety, and social avoidance. Tests and test sales designed to assess for response distortion did not reveal any indications of malingering or poor effort. In a telephone interview with the examinee's mother, she corroborated that her son has been diagnosed with mental health disorders and provided psychiatric and psychological treatment interventions. If the current allegations are determined to be accurate as reported, the examinee would be an appropriate candidate for placement into weekly sex-offender rehabilitation groups at a program such as REACH in Fort Lauderdale, Florida. Research has consistently shown a modest yet significant reduction in recidivism rates for sex offending with individuals who have completed treatment programs. The should also be considered for weekly individual counseling due to the presence of a major mental disorder. Additionally, he should be required to attend monthly psychiatric case management services to monitor the efficacy of his prescribed schedule of psychotropic medication. The examinee should be required to obtain and maintain full-time employment upon his eventual release from custody as research has indicated that individuals who are employed tend to re-offend at a lower rate. The examinee did not display any factors that would prevent him from benefiting from treatment services as outlined above. (*See* Exhibit 3 at p 6-7)

As noted by Dr. Brannon's report, professional testing has confirmed that Michael is amenable to treatment and "He reported that he has never experienced any sexual attraction for prepubescent children. (*See* Exhibit 3 at p 6)" and "He reported that other than the current allegations, he has never engaged or attempted to engage in sexual activities with juveniles since he has been 18 years of age." (*See* Exhibit 3 at p 6).  Dr. Brannon suggests:

…[t]he examinee would be an appropriate candidate for placement into weekly sex-offender rehabilitation groups at a program such as REACH in Fort Lauderdale, Florida. Research has consistently shown a modest yet significant reduction in recidivism rates for sex offending with individuals who have completed treatment programs. The examinee should also be considered for weekly individual counseling due to the presence of a major mental disorder. Additionally, he should be required to attend monthly psychiatric case management services to monitor the efficacy of his prescribed schedule of psychotropic medication. The examinee should be required to obtain and maintain full-time employment upon his eventual release from custody as research has indicated that individuals who are employed tend to re-offend at a lower rate. The examinee did not display any factors that would prevent him from benefiting from treatment services as outlined above. (*See* Exhibit 3 at p. 6-7)

It is treatment for these specific mental health issues coupled with specific treatment for sexual offenders that will best serve Michael and more importantly society in general.

**2. The Need for The Sentence To Reflect The Seriousness Of The Offense, To Promote Respect For The Law, And To Provide Just Punishment**

Michael committed an offense that merits punishment. But under the circumstances of this case, a sentence above the mandatory-minimum sentence required pursuant to statue is not needed to achieve the notions underpinning 18 U.S.C. § 3553(a). Most significantly, Michael's personal remorse regarding his violations of his own moral compass is incalculable and is a sentence unto itself. Michael says:

> As soon as this happened, I was full of extreme remorse and regret for the harm that I did. I am aware that my actions at the time were hurtful, harmful and immoral, for that I am truly sorry. Furthermore, understanding that my apology can not undo the past, I truly hope that [A.R.] has the strength to move on from this and be the happy child I know she can be. I pray everyday that she finds peace and happiness in her life. I will forever regret breaking the trust [A.R.] had in me. (*See* Exhibit #4)

The propriety of such a sentence is further supported by Michael's significant and immediate acceptance of responsibility. Not only did Michael voluntarily speak to law enforcement, he was the one who contacted them to make his statement. During that statement he admitted wrongdoing and stated that "Even though I did what I did, I think it's …disgusting." (*See* PSI #51 at ℙ21).

Michael has never challenged the facts agreed to in the factual proffer in this case. In doing so, Michael has accepted responsibility and waived his right to trial which should not be taken lightly. He has spared the federal government as well as the State of Florida from the financial expense of proving this case. In addition to not pursuing the case to trial, Michael has agreed to waive his right to appeal the Motion to Dismiss that was filed in this case. (ECF #52) This waiver will save the federal government additional valuable resources in not pursuing this appeal.

It should be further noted, although it was Michael's constitutional right to take the deposition of the victim (in his corresponding case with the State of Florida), he chose not to do so.  Michael made the decision to spare the victim the need to sit for a deposition and relive the incident in great detail.  Depositions are very difficult for victims in all cases and even more so in sexual cases.  Although this decision was specific to the State of Florida prosecution, it should still be considered since the cases revolve around the exact same allegations and were prosecuted simultaneously.  Had Mr. Simpson chosen to depos the victim, he would have been able to use the sworn deposition in his federal trial.

A punishment is "just" insofar as it "fit[s] the crime," and "reflect[s] the gravity of the defendant's conduct." *Simon v. United States*, 361 F.Supp.2d 35, 43 (E.D.N.Y. 2005).  The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?, 89 Minn. L. Rev. 571, 590 (February 2005). The guidelines include none of the factors bearing on Selene's degree of culpability.

Michael's character and willingness to make amends for his actions have demonstrated that he is deserving of a downward variance from the Sentencing Guidelines.  Michael submits that the requested sentence sends the proper message that this kind of conduct will be punished appropriately, but not excessively.  Respect for the law is undermined both by sentences that are too short and sentences that are too long.

### 3.  To afford adequate deterrence to criminal conduct

The principle of general deterrence is based on the unsupported premise that lengthy prison sentences deter crime. This faulty conception has resulted in the mass incarceration of individuals in the United States.

> For the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period, than any other democracy. In fact, with 5 percent of the world's population, the U.S. is home to 25 percent of its prisoners. There are five times as many people incarcerated today than there were in 1970. . . [The] archipelago of prisons and jails costs more than $80 billion annually — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder et al., What Caused the Crime Decline?, Brennan Center for Just., 22-23 (Feb. 12, 2015), available at https://www.brennancenter. org/publication/what-caused-crime-decline.

According to the U.S. Department of Justice's National Institute of Justice, "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime." National Institute of Justice, Five Things About Deterrence, pg. 1 (May 2016). According to the same study, "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment" and crime is deterred "by increasing the perception that criminals will be caught and punished." Ibid. Although increased severity of punishment obviously has some role in deterrence, the most powerful deterrents are actually certainty and promptness of punishment. Tonry, Michael. Purposes and Functions of Sentencing. Page 28 (2006) (noting that "[i]maginable increases in severity of punishments do not yield significant (if any) marginal deterrent effects.").

In *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008), the D.C Circuit explained that an over-emphasis on deterrence elevates one section 3553 consideration over the others and that the effect of general deterrence can easily be overstated. More specifically, the court wrote:

> Moreover, the Government's argument based on deterrence alone is flawed because it elevates one § 3553(a) factor – deterrence- above all others…….
> In any event, we question the force of the government's deterrence argument,

even when considered in isolation. Although Gardellini may have been treated
leniently, the next similarly situated tax offender cannot expect the same
treatment. Another defendant in the same situation might well receive an
above Guidelines sentence. In light of the sentencing discretion afforded to district
courts by the Supreme Court's sentencing decisions, only a fool would think that he
or she would necessarily receive the same sentence as Gardellini. Id.

From the perspective of general deterrence to the public at large, a probationary sentence
will serve the punishment aspect of sentencing while also tailoring an appropriate sentence for
the individual acts committed in this case.  *See* Steven N. Durlauf & Daniel S. Nagin,
Imprisonment and Crime: Can Both be Reduced?, 10 Criminology & Pub. Pol'y 13, 37 (2011)
(deterrence is achieved with certainty of punishment, not its severity); Raymond Pasternoster,
How Much Do We Really Know About Criminal Deterrence, 100 J. Crim. L. & Criminology
765, 817 (2010)([I]in virtually every deterrence study to date, the perceived certainty of
punishment was more important than the perceived severity). "[T]here is no decisive evidence to
support the conclusion that harsh sentences actually have a general and specific deterrent effect
on potential white-collar offenders."  Zvi D. Gabbay, Exploring the Limits of the Restorative
Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421,
448-49 (2007).

Here, the Court should avoid over emphasizing the need for general deterrence.  It is a
factor the Court must consider, but, because it is no more important than the other factors, the
Court should not allow it to carry the day in sentencing Michael.  Deterrence is fully achieved
not in the length of the sentence but in the certainty of prosecution.

### 4.  To Protect the Public from Further Crimes of Michael Simpson

Having established that prison sentences, regardless of length, has little to no impact on
general deterrence, this section demonstrates that the § 3553(a) factor of specific deterrence also
supports Michael's request for a variance.

In addition to the sentence in state and federal courts, Michael will be subject to the designation as a Sexual Predator and will be required to submit to the Sexual Offender Registration Notification Act (SONRA). SORNA provides a comprehensive set of minimum standards for sex offender registration and notification in the United States. Sex offender registration is a system for monitoring and tracking sex offenders following their release into the community.  The registration provides important information about convicted sex offenders to local and federal authorities and the public, such as offender's name, current location and past offenses[9].  The special conditions of supervised release restrict use of computers, internet, self-employment, debt accumulation, contact with minors, allows for permissible searches and unannounced searches, financial restrictions and etc.

There is not a day that will go by that Michael will not be reminded of the punishment that comes with what he did.  The onerous conditions of his release and the sexual predator designation will be a daily reminder to Michael and will certainly affords adequate deterrence to any future criminal conduct.

Specific deterrence does not weigh in favor of imprisoning Michael for more than the prescribed 10-year mandatory-minimum sentence.  Prior to his arrest in this matter, Michael has had no prior criminal history record.  Michael has fully accepted that what he did was wrong, he is disgusted by his actions and is fully amenable to treatment.  This combination of acceptance and treatment is the most effective and direct manner to prevent future recidivism.   Although it might be easy to see Michael as nothing more than a sexual predator, he is still a very young man who made a terrible mistake and only wants to do better for the future and is willing to do whatever it takes to show this court that it will never happen again.  This factor supports the

---

[9] https://www.justice.gov/criminal-ceos/sex-offender-registration-and-notification-act-sorna

propriety of a significant downward variance. See *United States v. Clay*, 583 F.3d 739 (11th Cir. 2007) (granting a significant downward variance based on the fact that the defendant was not likely to re-offend); *United States v. Chase*, 560 F.3d 828, 831 (8th Cir. 2009) (finding that lack of criminal history can be considered as the basis for a downward variance even though it is taken into account in calculating the guideline range); United States v. Howe, 543 F.3d 128, 133 (3d Cir. 2008) (same).

Michael does not have any prior arrests or convictions, placing him not only in criminal history category I, but making him a true first offender. As such, he is among the category of offenders that present the lowest risk to re-offend. *United States v. Oldani*, 2009 WL 1770116 (S.D.W. Va. June 16, 2009) (contains a thorough discussion of the reduced risk of recidivism posed by true first offenders). While his placement within criminal history category "I" gives Michael a sizeable benefit based on his lack of criminal history, category "I" can be broken down into further classifications with widely varying rates of recidivism: (a) offenders with no prior arrests or convictions; (b) offenders with prior arrests but no prior convictions; (c) offenders with prior convictions that do not count towards criminal history points; (d) offenders with one criminal history point. *See* U.S. Sentencing Commission, Recidivism and the "First Offender", May 2004 available at http://www. ussc.gov/publicat/recidivism_firstoffender.pdf. Based on empirical research, the commission found that a defendant with no prior arrests nor criminal history has only a 6.8 percent chance of recidivism. *Id.* This was the lowest rate of recidivism of any group in the study and sharply lower than the rate of those defendants with prior arrests but no convictions (17.2 percent) or defendants with one criminal history point (22.6 percent). (Defendants with prior convictions that did not count towards a criminal history points

had an 8.8 percent rate of recidivism). *United States v. Oldani*, 2009 WL 1770116 (S.D.W. Va. June 16, 2009).

The case of *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012), is instructive here.  In *Prosperi*, the defendants proceeded to trial and were convicted by a jury of conspiracy to defraud the United States. Although their guidelines range was 87-108–months incarceration, the district court sentenced the defendants to six months of home monitoring, three years of probation, and 1,000 hours of community service. *Id*.  The First Circuit affirmed the variance, explaining that the district court properly weighed the § 3553(a) factors and considered the roles of punishment and deterrence. *Id*. at 42.

The *Prosperi* court utilized as its rationale similar factors to those at issue here. For one, the court recognized the punishment inherent to a first-time offender who is thrust into the criminal justice system:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed

*Id*. at 48.

Michael, since the day of his arrest is living the seriousness of his actions.  He is getting a front row seat to the gravity of the criminal justice system.  Michael has been prosecuted simultaneously by both the State of Florida and the United States Government.  The arrest, the public shame, the effect on his family and his future, lawyers, court appearances, guilty plea and conviction have all had the anticipated effect to deter Michael from any future criminal activity.

The certainty of the punishment has achieved that goal.  Michael's total acceptance of responsibility, his personal characteristics, his willingness to accept treatment, the support he has from his family and in the community, his desire never again to be in a such a position again and

the other factors discussed above demonstrate that he is not a risk to reoffend.  Incarceration for

the prescribed mandatory-minimum sentence with court ordered mental health and sexual

offender treatment is more than sufficient to deter him from committing any future crime.

### 5.  The sentence should not be greater than necessary to meet with the goals of the statute

Finally, the instruction that a sentence "be sufficient, but not greater than necessary" to

achieve the goals set forth in section 3553(a) include the principles of mercy and compassion.

Here, Michael respectfully asks that the Court temper its sentence with some mercy and

compassion. They too have a place at the table at sentencing.  Even before *Booker* returned

sentencing authority back to the courts, there were Judges who recognized that mercy and

compassion should be considered in sentencing those persons who have transgressed our laws

and norms. United States District Court for the Eastern District of New York Judge Jack

Weinstein, wrote the following:

> Mercy is seldom included on the list of "traditional" rationales for sentencing. It is, however, evinced by the federal sentencing statute, 18 U.S.C. §3553(a), which provides,…that the lowest possible penalty consistent with the goals of sentencing be imposed. See also United States v. Johnson, 964 F.2d 124, 125 (2nd Cir. 1992) ("the United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom"). The notion that undue harshness should be avoided by those sitting in judgment has long been a part of the human fabric and spirit. Lenity is often the desirable route. *United States v. Blarek*, 7 F.Supp.2d 192, 210 (E.D.N.Y. 1998) (J. Weinstein).

Michael was no doubt wrong in what he did in this case.  He has never contested that his

actions were anything but wrong and he has continually been ashamed at what he did that night.

In fact, his statement about the disgust he has for what he did shows how he truly feels about his

actions.  He offers no excuse for what he has done and does not wish to diminish his actions in

any manner.  Michael only wants to make amends for his actions and to try and move forward

with his life in the best way that he can.

### a.  Prison Has Greater Significance for Those Imprisoned for the First Time

Federal courts have granted variances after considering that the defendant has not previously served time in prison. See *United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming non-guideline sentence, justified in part by judge's finding that prison would mean more to this defendant than one who has been imprisoned before, which resonated with goal of "just punishment" in Section 3553(a)(2)(A) and "adequate deterrence" in Section 3553(a)(2)(B*); United States v. Jewell*, 2009 WL 1010877 (E.D. Ark. April 15, 2009) (guideline range near the statutory maximum of 5 years was inappropriate for first time offender); *United States v. Cull*, 446 F. Supp. 2d 961 (E.D. Wis. 2006) (non-guideline sentence of 2 months in jail and 4 months home confinement, when advisory range was 10–14 months for defendant who had never been confined, was sufficient to impress on him the seriousness of his crime and deter him from re-offending); *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) (generally, a lesser prison term is sufficient to deter one who has not been subject to prior lengthy incarceration).

A variance is necessary to do justice in this case, and will also contribute to the evolution of responsible guidelines.  As the Supreme Court emphasized, when judges articulate reasons for sentences outside the guideline range, they provide "relevant information to both the court of appeals and ultimately the Sentencing Commission," which "should help the Guidelines constructively evolve over time, as both Congress and the Commission foresaw." *Rita*, 551 U.S. at 357-58.  Nevertheless, given the fact that he has absolutely no prior criminal history, his personal characteristics and his timely acceptance of responsibility along with his cooperation in the investigation, the Court may and should temper the sentence it imposes upon Michael.

### 6.  The Kinds of Sentences Available:

Here, the Court must impose a sentence of imprisonment not less than ten (10) years and up to life, and could impose supervised release for a period of five (5) years to life.  This Court must now consider all of "the kinds of sentences available" by statute, § 3553(a)(3), even if the "kinds of sentence . . . established [by] the guidelines" zones recommend only a lengthy prison term.  See *Gall*, 552 U.S. at 59.   18 USC § 3553(a)(3), permits the Court to impose several different kinds of sentences, ranging from probation and home detention to a period of incarceration.

Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury."  28 U.S.C. § 994(j). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service."  See Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).

### 7.  The Advisory Sentencing Guidelines:

The critical question in Michael's case is the exact weight this Court should give to the relevant factors in fashioning an appropriate sentence.  As recognized in *Gall*, district courts "may not presume that the Guidelines range is reasonable." 552 U.S. at 49.  Thus, mitigating

circumstances and substantive policy arguments that were formerly irrelevant in all but the most

unusual cases are now potentially relevant in every case.  The government has agreed in the plea

agreement (ECF #52 at ❡9) to recommend a sentence of 20 years (240 months).

Michael unquestionably made the worst decision of his life when he did what he did in

this case.  There is absolutely no excuse for his actions.  Michael has accepted fully

responsibility in for what he has done.  He has shown remorse from the moment this has

happened.  This is evidenced in his voluntary confession to law enforcement along with his

statement of "disgust" towards his actions.  It is further seen in his decision not to contest the

facts of the case and not subject the victim to the stresses of deposition, in court litigation or

testifying at trial.  Nonetheless, a sentence of 10 years is sufficient to achieve the goals of

sentencing while the special conditions of treatment and mental health will further protect

society.  With regard for promoting respect for the law and providing just punishment, it must be

remembered that "[r]espect for the law is promoted by punishments that are fair...not those that

simply punish for punishment's sake.  There is no reason to believe that respect for the law will

increase if a defendant who deserves leniency is sentenced harshly any more than there is reason

to believe that respect for the law will increase if a defendant who deserves a harsh punishment

receives a slap on the wrist." *United States. v. Stern*, 590 F.Supp.2d 945 (N.D. Ohio).  Applying

the §3553 sentencing factors to the appropriate sentencing guidelines in this case will clearly

warrant a variance and a sentence of ten years.

8. **The Need To Avoid Unwarranted Sentencing Disparities Among Defendants
   With Similar Records Who Have Been Found Guilty Of Similar Conduct**

"Congress [through the Sentencing Guidelines]…sought to eliminate only 'unwarranted'

disparities, while enabling judges to consider those factors that cannot be tallied in advance, but

that may create 'warranted' disparities in sentencing."  *United States v. Jaber*, 362 F.Supp.2d

365, 373 (D. Mass. 2005).  Section 3553's direction to consider the "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," is meant to focus the Court both on disparities between different judges and districts, as well as between co-defendants in similar cases. *United States v. Parker*, 462 F.3d 273, 277 (3rd Cir. 2006); *United States v. Lewis*, 594 F.3d 1270, 1276 (10th Cir. 2010); *United States v. McGee*, 408 F.3d 966, 988 (7th Cir. 2005); *U.S. v. Lazenby*, 439 F.3d th 928, 934 (8th Cir. 2006) (recognizing that extreme disparities in the sentences imposed on coconspirators could "fail[] to promote respect for the law")

In *United States v Brian Schmuhl*, 20-CR-60009-SMITH, Brian Schmuhl entered a plea to one count of Enticement of a Minor and one count of Attempted Enticement of a Minor. Pursuant to the "Factual Proffer" (US v Schmuhl 20-CR-60009-Smith ECF#25) Mr. Schmuhl was a engaged in ongoing (Oct. 18, 2018-Nov. 24, 2018) internet based communications with a 16 year old minor.  During these communications, Mr. Schmuhl, a firefighter, engaged in sexually explicit conversations and requested pornographic images of the victim.  Posing as a 12-year-old female, an undercover BSO Detective made contact with Mr. Schmuhl and engaged in several months of sexually explicit communication.  Additionally, Mr. Schmuhl sent images of his penis and videos of adults engaging in sexually explicit conduct.  Mr. Schmuhl was ultimately sentenced by this court to **135 months** in prison.

In *United States v Fabio Lopez*, 20-CR-60081-DIMITROULEAS, Fabio Lopez entered a plea to one count of Enticement of a Minor.  Pursuant to the "Factual Proffer" (US v Lopez 20-CR-60081-Dimitrouleas ECF#56), Mr. Lopez was an officer with the United States Customs and Border Patrol (CBP) who after meeting a woman while working in his official law enforcement capacity began a friendship with the woman and was ultimately invited to the family home.  Mr.

Lopez gave the impression that in his official capacity as a CBP officer he would be able to help with the family's immigration status.

Mr. Lopez began communicating with the minor victim on her cell phone and set up a meeting in the parking lot of an apartment complex.  During this meeting in the parking lot, Mr. Lopez and the victim say in Mr. Lopez's vehicle.  Mr. Lopez was dressed in his CBP uniform and was wearing a firearm at the time.  During this meeting, Mr. Lopez tried to encourage the victim to allow him to take "sexy" photographs of her and then fondled the breast of the victim and began touching her vagina.    The court, adopting the recommendation of the parties, sentenced Mr. Lopez to **10 years** in prison.

In *United States v Leverick Johnson*, 21-CR-60014-ALTMAN, Leverick Johnson entered a plea to one count of Enticement of a Minor.  Pursuant to the "Agreed Factual Basis for Plea" (US v Johnson 21-CR-60014-Altman ECF#44), Mr. Johnson was a middle school teacher and junior varsity football coach at the victim's school.  While acting in that official capacity, he befriended the minor victim and engaged in a month-long sexual communication with her. During this communication, Mr. Johnson requested and received sexual photographs and even summoned the minor to perform oral sex on him at the school.  The court, adopting the recommendation of the parties, sentenced Mr. Johnson to **10 years** in prison.

In *United States v Jocques Richardson*, 20-CR-60142-SMITH, Jocques Richardson entered a plea to one count of Enticement of a Minor and one count of Attempted Enticement of a Minor.  Pursuant to the "Factual Proffer" (US v Richardson 20-CR-60142-Smith ECF#26) Mr. Richardson was the running coach for the minor victim.  While acting in that capacity, Mr. Richardson began communicating with the minor via "Instagram."  The conversation then became more intimate at which time Mr. Richardson created a separate "Instagram" account.

The conversations centered around the Mr. Richardson performing oral sex on the victim. Ultimately law enforcement became involved and began to monitor the conversations between the victim and Mr. Richardson.  During one of these monitored conversations, Mr. Richardson requested to pick up the victim from her home so that they could engage in oral sex.  Mr. Richardson was arrested while on his way to the residence.  Mr. Richardson admitted to touching the victim's vagina, seeking sexually explicit photographs and traveling to meet the victim for the purposes of sex.   The court, adopting the recommendation of the parties, sentenced Mr. Johnson to **10 years** in prison.

## VI.    SENTENCE REQUESTED

Counsel believes this Court, pursuant to 18 USC § 3553 and the other various applicable sentencing codes cited in this memorandum, may consider the specific nature of the defendant's conduct, his immediate acceptance of responsibility and the need for parity in sentencing compared to similar situated defendant's in fashioning an appropriate sentence in this matter.

It is very clear that Michael has significant mental health issues that have plagued him his entire life.  It is treatment for these specific mental health issues coupled with specific treatment for sexual offenders that will best serve Michael and more importantly society in general.  A sentence laden with mental health treatment coupled with sexual offender treatment and special conditions will be a sentenced tailored to the specific needs of Michael and this case.

Consistent therewith, counsel is requesting the court impose a sentence of ten (10) years of incarceration followed by twenty (20) years of sex offender probation with the special condition that he submit to mental health and sexual offender treatment upon his release.  A sentence as such would keep Mr. Simpson under federal supervision for 30 years until he is 54

years old.  Counsel submits that such a sentence is sufficient and not greater than necessary

sentence in this case while still providing adequate punishment for Michael.

### a.  THE COURT SHOULD WAIVE IMPOSITION OF A FINE

The Sentencing Guidelines provide that the Court may decline to impose a fine "where

the defendant establishes that he is unable to pay and is not likely to become able to pay any

fine." U.S.S.G. § 5E1.2(a). Under U.S.S.G. § 5E1.2(d), the Court, in determining the amount of a

fine, if any, "shall consider," among other factors, (1) "any evidence presented as to the

defendant's ability to pay the fine (including the ability to pay over a period of time) in light of

his earning capacity and financial resources;" (2) "the burden that the fine places on the

defendant and his dependents relative to alternative punishments;" (3) "any restitution or

reparation that the defendant has made or is obligated to make;" and (4) "any collateral

consequences of conviction."

Here, Michael does not have the ability to pay a fine, as the PSR has noted. Michael faces

imprisonment for at least the next ten (10) years, and has little or no ability to access or earn

funds with which he could pay any fine.

Under U.S.S.G. § 5E1.2(e):

> If the defendant establishes that (1) he is not able and, even with the use of a reasonable
> installment schedule, is not likely to become able to pay all or part of the fine required by
> the preceding provisions, or (2) imposition of a fine would unduly burden the defendant's
> dependents, the court may impose a lesser fine or waive the fine. In these circumstances,
> the court shall consider alternative sanctions in lieu of all or a portion of the fine, and
> must still impose a total combined sanction that is punitive.

Here, based upon the facts set forth herein and in the PSR, Michael submits that he has

established inability to pay a fine, even with a reasonable installment schedule. Michael has no

assets due to his arrest and his stage in life.  There is nothing before the Court to suggest that

Michael is likely to become able to pay a Guidelines fine at any time in the foreseeable future, if ever.

As the Tenth Circuit Court of Appeals has found, "it is an incorrect application of the guidelines to impose a fine that a defendant has little chance of paying." *United States v. Labat*, 915 F.2d 603, 606 (10th Cir. 1990). Imprisonment, along with the collateral consequences of conviction, will impose an adequately punitive sentence in the circumstances presented.

**VII. CONCLUSION**

Based upon the facts and factors set forth above, Michael Simpson respectfully requests this Court to impose a sentence of ten (10) years of incarceration followed by twenty (20) years of sex offender probation with the special condition that he submit to mental health and sexual offender treatment upon his release.  Michael Simpson and Counsel thank this Court for considering our Memorandum in Aid of Sentencing and the many letters that have been received from family and friends of Michael. Counsel will have additional remarks to make at the time of sentencing.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 29, 2022 the undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record by CM/ECF.

Respectfully submitted,
/s/ _David J. Sobel
David J. Sobel, Esq.
Florida Bar No. 57336
David J. Sobel, P.A.
12 Southeast 7th Street, Suite 700
Fort Lauderdale, Florida 33131
Telephone:  (954) 463-0773
Facsimile:   (954) 839-9005
Email: sobeldefense@yahoo.com